## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KHABEER AKBAR,                          :

    Plaintiff,                       :
                                   Case No. 3:10cv00069

 vs.                                   :
                                   District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                      :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                :

            Defendant.              :

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

In May 2006 Plaintiff Khabeer Akbar's filed an application with the Social Security Administration seeking Disability Insurance Benefits (DIB).  He asserted in his application that he was eligible to receive DIB because starting February 21, 2004, he had been under a disability due to diabetes, high blood pressure, obesity, a lung disorder, and anxiety.

After initial administrative denials of his DIB application, the matter proceeded to a hearing before Administrative Law Judge (ALJ) Thomas R. McNichols, III.  (Tr. 21-

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

39).[2]  ALJ McNichols later issued a written decision denying Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 10-20).

Plaintiff brings the present case challenging ALJ McNichols' decision.  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.  Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits.  Or, at a minimum, Plaintiff seeks a remand to correct certain errors.  The Commissioner seeks an Order affirming ALJ McNichols' decision.

The Court has subject matter jurisdiction over the parties' dispute in this matter.  *See* 42 U.S.C. §405(g).

## II.    BACKGROUND

### A.    <u>Plaintiff's Background and The Administrative Hearing</u>

Plaintiff was 54 years old on the date his claimed disability began.  (Tr. 32).  His age placed him in the category of a person "closely approaching advanced age" under Social Security Regulations.  *See* 20 C.F.R. §404.1563(d); *see also* Tr. 32.  Seven months after the ALJ's decision, Plaintiff turned 55 years old, placing him category of a person of "advanced age."  *See* 20 C.F.R. §404.1563(e); *see also* Tr. 32.

---

[2]  Citations to the administrative record are to the page numbers set by the Court's case management/electronic case filing system.

2

During the administrative hearing, Plaintiff testified that he graduated from high school and attended college for one year.  (Tr. 40).  He served in the United States Navy from 1969 to 1971 and thereafter had vocational training as a heavy machine operator. *Id.*

Plaintiff is married with no dependent children.  At the time of the ALJ's hearing, Plaintiff was 6 feet 5 inches tall and weighed 350 pounds.  He explained that his weight fluctuated because of medication and that his more normal weight was 320 pounds.  (Tr. 38-39).

Plaintiff's last full-time job had been as an appliance salesman at a home improvement store.  He stopped working that job in February 2004 because of arthritis in his knees and carpal tunnel syndrome.  (Tr. 43).  He worked part-time from August 2005 to about April 2006 delivering papers.  (Tr. 44).  He stopped working that job because of his various health problems.  He noted that he "was slipping, and falling, and ... wasn't able to handle the terrain..., walking and delivering the papers."  *Id.*  Plaintiff had previously worked part-time as a mediator.  (Tr. 59, 65).

Plaintiff testified that he was first diagnosed with diabetes in 1980.  (Tr. 52).  He has a hard time controlling his diabetes.  For treatment he used insulin at one point and used pills at the time of the ALJ's hearing.  (Tr. 44-45).  He explained that diabetes caused swelling in his legs and tissue scarring.  He had lost feeling in his ankles and toes, and these areas were numb all the time.  (Tr. 45).  The numbness was gradually worsening.  (Tr. 46).

Plaintiff further testified that he has arthritis in both his knees and in his lower back. He noted, "I get the same feeling in all my joint. I can't hardly move them." (Tr. 47). He has constant pain in his knees and back. (Tr. 48). Plaintiff takes medication for arthritis. (Tr. 50). Plaintiff estimated that his pain level was about an 8, on a 0 to 10 scale (0 equaling no pain; 10 equaling the worst pain imaginable). (Tr. 55).

Plaintiff takes medication for high blood pressure but it did not help control it. He explained that his blood pressure was "excessively high," causing him to sometimes get dizzy. (Tr. 48-49). But the dizziness occurs infrequently. (Tr. 49).

Plaintiff has shortness of breath, which he treats with medication. Without medication, "it makes it difficult for [him] to breathe or walk anywhere." (Tr. 50). He had not been hospitalized for a breathing attack or an incident when he could not catch his breath. His breathing difficulty occurred mainly upon physical exertion. (Tr. 50-51).

Carpal tunnel syndrome caused pain in Plaintiff's wrists and reduced his grip strength. (Tr. 51). The pain caused him to drop things occasionally. He was able to button clothes, but it was difficult for him. (Tr. 52).

Plaintiff testified that he had been told he has depression. (Tr. 53). He explained that depression made him feel inadequate – he can't work, he can't help his wife, he can't help around the house, and his wife did all the housework. *Id.* He was not being treated with medication or counseling, although he apparently had a counselor at one point, who died. *Id.* Plaintiff was not asked any further questions about his mental health during the ALJ's hearing.

4

Plaintiff's most comfortable position was sitting.  He rarely slept at night, only about 3 or 4 hours.  (Tr. 55).  This was due to "the complications of the diseases ... that won't let him sleep long."  *Id*.  He explained, "diabetes causes you to constantly have to urinate.  That's one of the problems.  The other problem is sometimes I wake up in a cold sweat because my blood pressure's out of control."  *Id*.  He napped daily in the afternoon 4 to 6 hours but with interruptions every 2 hours because of his need to urinate.  (Tr. 64-65).

He estimated that he could walk 1 block but would then have to stop due to shortness of breath.  (Tr. 55-56).  He testified that he could stand for one minute at a time before he needed to begin looking for a place to sit because of pain in his legs.  He could sit for maybe 2 hours and would then need to use the restroom to urinate "because of the diabetes again."  (Tr. 56-57).  He can lift about 5 pounds.  (Tr. 58).  When asked why he could not lift more than 5 pounds, Plaintiff answered, "I don't have the upper body strength to do that ... because of pain in my joints."  (Tr. 58).

During a typical day, Plaintiff sometimes listened to books, he did not read books.  He sometimes skipped lunch or dinner, he napped in the afternoon, and he watched television in the evening.  (Tr. 63-64).  He did not do the following: cooking, dish washing, sweeping, mopping, washing clothes, shopping, going to church, visiting friends (sometimes friends visit him), going to the movies, participating in sports, exercising, or gardening.  (Tr. 59-61).  He cut the grass with a riding lawn mower.  (Tr. 61).  He traveled by car to a family reunion in Atlanta in 2006.  (Tr. 61-62).  He had trouble

5

maintaining his personal hygiene.  (Tr. 63).  He described his appetite as "too large."  (Tr.

63).  And he did not smoke cigarettes or use marijuana or other controlled substances.

(Tr. 62-63).

    B.    **Medical Evidence**

    The parties have provided detailed and informative descriptions of Plaintiff's

medical records supported with many specific citations to evidence of record.  *See* Doc.

#7 at 376-80; Doc. #11 at 399-402.  In light of this and upon the Court's consideration of

the record as a whole, there is no need to expand upon the parties' well-written factual

descriptions.   A brief summary of the medical opinions suffices.

    Plaintiff does not have at treating mental health physician, psychologist, or

counselor.

    In July 2006 Psychologist Mary Ann Jones, Ph.D. examined and evaluated

Plaintiff for the Ohio Bureau of Disability Determinations.  (Tr. 282-86).  Dr. Jones

diagnosed Plaintiff with "Psychological Factors Affecting Physical Condition" and

"Posttraumatic Stress Disorder (mild)."  (Tr. 285).  She estimated his Global Assessment

of Functioning at 60, *id*., referring to moderate symptoms.[3]  Diagnostic and Statistical

---

[3]  Health care clinicians perform a Global Assessment of Functioning to determine a person's
psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is,
in general, a snapshot of a person's "overall psychological functioning" at or near the time of the
evaluation.  *See Hash v. Commissioner of Social Sec*., 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see
also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

<u>Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34.  At the time of the interview,

Plaintiff was working part-time as a newspaper carrier.  (Tr. 282).

> As to his mental work abilities, Dr. Jones wrote:
>
> Mr. Akbar's mental ability to relate to others, including fellow workers and supervisors, is moderately impaired by his preoccupation with his medical symptoms and his anxiety and depressive symptoms.  He presents as able to relate sufficiently to coworkers and supervisors, in order to perform simple, repetitive tasks not requiring complicated or detailed verbal instructions. He apparently is able to relate adequately to family, and to store clerks within his ADL [activities of daily living] in order to complete basic household chores.  Mr. Akbar related adequately during this interview process, to the examiner and other office reception staff.
>
> Mr. Akbar's mental ability to understand, remember, and follow instructions is mildly impaired, and this is more so by his overall psychological condition than by any cognitive limitations.  He is capable of comprehending and completing simple, routine ADL tasks, both at home and in the community.  He showed no comprehension or memory problems during the informal assessment.
>
> His mental ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks is not impaired.  He demonstrated no problems with attention or concentration during the interview and informal assessment.  His pace and persistence were reasonable for the clinical interactions and test tasks required on this day.  He related no problems on his current part-time employment because of difficulties with work focus or speed of performance.
>
> Mr. Akbar's mental ability to withstand the stress and pressures associated with day-to-day work activity is judged as mildly to moderately impaired. He shows mild to moderate mental limitations in the areas of relating because of his anxiety and depression, as well as his preoccupation with his medical limitations.  Mental calculative abilities proved intact.  Should benefits be granted, Mr. Akbar has the capability of managing them in his own best interest.

(Tr. 285-86).

A few months later, in September 2006, psychologist Karen Terry, Ph.D., reviewed the record and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form.  (Tr. 291-304).  Her review covered records from February 21, 2004 to the date of her review in September 2006.  (Tr. 291).

Dr. Terry checked a box indicating her opinion that Plaintiff had an anxiety-related disorder and noted it was posttraumatic stress disorder.  (Tr. 296).  She also checked a box indicating her opinion that Plaintiff had a somatoform disorder, noting "psychological factors affecting physical condition."  (Tr. 297).  Plaintiff, in Dr. Terry's opinions, had a mild limitation in his activities of daily living; a moderate limitation in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (Tr. 301).

When assessing Plaintiff's mental residual functional capacity, Dr. Terry indicated that Plaintiff had no marked restrictions in his work abilities and had moderate limitations in the following areas: ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 305-06).  Dr. Terry explained her opinions as follows:

8

clmt [claimant] is a 57 y.o. year old with a 12th grade educations.  He alleges disability due to anxiety.

Served in the Navy and received an Honorable Discharge (1968-71).

Clmt arrived on time to exam, having driven himself.  Appropriate grooming, hygiene and dress.  Was cooperative.  Relevant, coherent thought processes.  Sad affect w/ resigned and dysphoric demeanor.  Maintained limited eye contact.

Alert and oriented X4.  Recent and remote memory intact.  Presented as alert to distracted with regard to his degree of consciousness.  Recalled 3 out of 3 objects at 5 minutes.  Able to interpret a simple proverb.  Able to perform basic math functions.  Low average estimated intelligence.  Adequate insight and judgment.

Lives with family.  Completes self-care and household ADLs.  Is able to cook, shop, do yard work and handle finances.  Clmt reports he is able to finish what he starts, is able to follow written and spoken instructions.  He delivers papers and takes two classes.  He encourages others to visit him.  Reports he is easily irritated and has mood swings.  GAF=60.

Clmt is capable of u/r/f [understanding/remembering/following] moderately complex instructions and can sustain c/p/p [concentration/persistence/pace] to perform moderately complex tasks.  Clmt will likely have difficulty with very complex tasks.  Clmt would benefit from a workplace that requires only limited interactions with others.  Clmt would also benefit from a low stress workplace that doesn't have strict quota/pace/production requirements.

Clmt's statements are credible and supported by objective medical evidence.

CE [consultative examiner, Dr. Jones] findings are given weight.

(Tr. 307).

In October 2006 Elizabeth Das, M.D. reviewed the record and opined that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds,

stand and/or walk about 6 hours in and 8-hour workday; and sit about 6 hours in and 8-hour workday.  (Tr. 311).  Dr. Das explained that MRIs in June 2006 showed lumbar spondylosis at L2-3, L5-S1 and osteoarthritis of Plaintiff's right and left hip; he had good range of motion in his cervical spine; his lungs were clear; he had full range of motion in his lumbosacral spine; a straight leg test was negative; and his gait was normal.  (Tr. 311).

Dr. Das noted that Plaintiff had mild degenerative joint disease of hips and spine, and had neck and shoulder pain from a whiplash injury sustained in May 2006 with no neurological deficits.  (Tr. 315).  She recognized that Plaintiff had high blood pressure and diabetes without end-organ damage.  *Id*.  She lastly noted, "his alleged limitations outweigh medical evidence in file."  *Id*.  Dr. Das also recognized that the record did not contain a treating or examining medical source statement about Plaintiff's physical capabilities.  (Tr. 316).

On March 22, 2007, John Waddell, Ph.D. reviewed the record and agreed with Dr. Jones' mental assessment "as written."  (Tr. 322).

On March 26, 2007, Demitri Teague, M.D. reported that Plaintiff's "chest CT was virtually nml [normal] without pathology noted.  Lung fields have been clear on recent examinations...."  (Tr. 331).  Dr. Teague recommended a pulmonary function study "to help with determination for this Clmt."  *Id*.

Damian M. Danopulos, M.D. performed a pulmonary study in April 2007.  Dr. Danopulos reported, "mild degree obstructive and restrictive lung disease without BD

[bronchiodilator, Albuterol[4]] effect."  (Tr. 334).  Dr. Danopulos also reviewed the record and agreed with Dr. Das's assessment "as written."  (Tr. 319).

Plaintiff's treating physician, Isaac Corney, M.D., completed a Residual Functional Capacity Questionnaire on January 28, 2008.  (Tr. 353-55).  Dr. Corney indicated his opinion that during an 8-hour day, Plaintiff could sit for 7 hours, stand for 3 hours, walk for 2 hours, and sit/stand/walk for 5 hours.  (Tr. 353).  According to Dr. Corney, Plaintiff could perform full-time sedentary work, referring to work that "[r]equires lifting and/or carrying/a maximum of 10 lbs; involves mostly sitting but standing and walking are occasionally required.  *Id*.  Dr. Corney further believed that Plaintiff could perform only part-time light work.  *Id*.  Dr. Corney opined that Plaintiff would need to avoid working at unprotected heights and exposure to dust, fumes, or gas.  (Tr. 354).  Plaintiff was moderately restricted in his ability to work while exposed to marked changes in humidity and temperature and to substantial periods of outside work in the cold or rain.  He was mildly restricted in his ability to work around machinery and to drive automotive equipment.  He could not perform work requiring use of his feet/legs for repetitive movement.  *Id*.

Dr. Corney also thought that Plaintiff would need a 5 minute sit/stand option per hour while working; that Plaintiff would not need to lie down for sustained periods during

---

[4]  *See* Tr. 333.

the day; and would be reasonably expected to be absent from work 3 to 4 days per month. (Tr. 335).

Dr. Corney provided no written explanation in support of his opinions. (Tr. 353-55).

## III.  THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

### A.    The DIB Statute

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    Social Security Regulations

Administrative regulations require ALJs to employ a five-Step sequential evaluation when resolving whether a DIB applicant is under a disability. *See* Tr. 17-19;

*see also* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any Step

terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir.

2007), if fully considered, the sequential review answers five questions:

> 1.    Has the claimant engaged in substantial gainful activity?
>
> 2.    Does the claimant suffer from one or more severe impairments?
>
> 3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?
>
> 4.    Considering the claimant's residual functional capacity,[5] can she perform her past relevant work?
>
> 5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).


**C.    ALJ McNichols' Decision**

The ALJ's significant findings, for present purposes, began at Step 2 of the

sequential evaluation where he concluded that Plaintiff had severe impairments of " 1)

diabetes mellitus; 2) polyarthralgia; and 3) shortness of breath with a history of mild

COPD [chronic obstructive pulmonary disease]."  (Tr. 27).

---

[5]   The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

13

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.  (Tr. 30).

At Step 4 the ALJ concluded:

> the claimant has the residual functional capacity to perform medium ... subject to: 1) standing and/or walking no more than 5 hours of the work day; 2) no repetitive use of foot controls; 3) no work on uneven surfaces; 4) no bending, squatting, or kneeling; 5) occasional twisting and climbing stairs; 6) no climbing of ropes, ladders, or scaffolds; 7) no exposure to hazards; 8) frequent (not continuous) fingering; 9) no exposure to irritants. By definition, medium work requires the capacity to lift 25 pounds frequently and 50 pounds occasionally.

(Tr. 30).  Considering these abilities and limitations, together with Plaintiff's age, educational background, and work experience, ALJ McNicholds found that he could perform his past relevant work as a mediator and was therefore not under a disability. (Tr. 32).  Alternatively, the ALJ found that Plaintiff retained the ability to work a significant number of jobs that existed in the national economy.  (Tr. 32).  This alternative finding also led the ALJ to conclude that Plaintiff was not under a disability and was, therefore, not eligible to receive DIB.  (Tr. 32-34).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

14

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

A.  **Plaintiff's Mental Work Abilities**

**1.**

Plaintiff contends that the ALJ erred in failing to find that he suffered from a severe mental impairment at Step 2 of the sequential evaluation and in failing to consider Plaintiff's mental impairments beyond Step 2.  Plaintiff argues that, although he lacked a treating mental health medical source, all the mental health sources of record found that a severe mental impairment would interfere with his ability to work around others or to work under stress.  In support of this argument, Plaintiff relies on the opinions provided by Dr. Jones, Dr. Terry, and Dr. Waddell.

The Commissioner contends that the ALJ did not err at Step 2 because once he found Plaintiff to be under at least 1 severe impairment, he properly continued with his sequential evaluation.  The Commissioner further contends that substantial evidence supports the ALJ's findings concerning the Plaintiff's mental work limitations.

**2.**

Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – creates "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

When considering mental impairments at Step 2 (and Step 3), Social Security Regulations require ALJs to employ a "special technique."  *See* 20 C.F.R. §404.1520a(a);

16

*see also Rabbers*, 582 F.3d at 652.  The United States Court of Appeals for the Sixth

Circuit has described the special technique as follows:

> At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)."  If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  These four functional areas are commonly known as the "B criteria."  The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme.  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more.  If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled.  Otherwise, the impairment is considered severe and the ALJ will proceed to step three.

*Rabbers*,  582 F.3d at 652-53 (internal citations omitted).

At Step 2 in Plaintiff's case, the ALJ found that he had a medically determinable

mental impairment either explicitly, *see* Tr. 28, or at least by implication because the ALJ

assessed Plaintiff's limitations under the B criteria.  Had he found no medical

determinable mental impairment, there would have been no need to assess Plaintiff's

limitations under the B criteria.  *See Rabbers*, 582 F.3d at 652.

The ALJ evaluated, at Step 2, Plaintiff's limitations under the B criteria as:

| B Criteria | Plaintiff's Limitation |
|---|---|
| Activities of Daily Living | mild |
| Social Functioning | mild |

| Concentration, Persistence, or pace | mild |
|---|---|
| Episodes of Decompensation | none |

(Tr. 28-29).  The ALJ then concluded, "Because the claimant's medically determinable mental impairments have caused no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation..., they are not severe."  (Tr. 29).

**3.**

Regardless of whether the ALJ erred at Step 2 in the manner Plaintiff advocates, *see* Doc. #7 at 282-83, Plaintiff's better argument concerns the ALJ's complete failure to consider Plaintiff's mental impairments when assessing his residual functional capacity at Step 4 of the sequential evaluation.  This error is illuminated, somewhat counter-intuitively, by the lack of merit in the Commissioner's position.

The Commissioner contends that the ALJ did not commit reversible error at Step 2 by declining to find Plaintiff to be under a severe mental impairment because once the ALJ found Plaintiff under one severe impairment, he continued his sequential evaluation as the Regulations require.  This argument is correct to the extent it is consistent with the United States Court of Appeals' recognition of the following:

> This Court has ... found it "legally irrelevant" that some of a claimant's impairments were considered non-severe, when others were found to be severe, because a finding of severity as to even one impairment clears the claimant of step two of the analysis and should cause the ALJ to consider both the severe and non-severe impairments in the remaining steps....  In other words, "[o]nce one severe impairment is found, the

18

combined effect of all impairments must be considered, even if other impairments would not be severe."

*Simpson v. Commissioner of Social Sec.*, 344 Fed.Appx. 181, 190-91 (6th Cir. 2009)

(citing *Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008), citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)) (other citations and footnote omitted).

The above explanation does not assist the Commissioner in the present case because there is no indication that the ALJ considered Plaintiff's non-severe, although medically determinable, mental health impairments when evaluating his residual functional capacity.  This constituted error of law.  *Simpson* explains the regulatory basis for this error:

> Pursuant to 20 C.F.R. §[] 404.1523...:  "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity ... we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."

> Pursuant to 20 C.F.R. §[] 404.1545(a)(2)...: "If you have more than one impairment.  We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."

*See Simpson*, 344 Fed.Appx. at 191, n.1.  At Step 4 the ALJ did not mention Plaintiff's mental impairments, he did not include any mental-impairment restriction in his assessment of Plaintiff's residual functional capacity, and he did not mention the

19

restrictions placed on Plaintiff's work abilities by the only mental health medical sources of record – Dr. Terry and Dr. Jones, affirmed by Dr. Waddell.

It is, moreover, problematic to reach back to the ALJ's evaluation under the B criteria at Step 2 and apply it as support for his assessment of Plaintiff's residual functional capacity.  Problematic because there is no indication that the ALJ did so, thus no indication that he considered Plaintiff's non-severe mental impairments at Step 4.  And further problematic because the ALJ relied on at least one mental-work restriction at Step 2 but omitted it at Step 4.  The ALJ noted at Step 2, "the claimant could relate adequately to do simple repetitive tasks or work without complicated or detailed verbal instructions, and had related adequately to family and store clerks."  (Tr. 29).  Yet when assessing Plaintiff's residual functional capacity, the ALJ did not limit him "to simple repetitive tasks or work without complicated or detailed verbal instructions," as Dr. Jones believed he should be, and the ALJ did not provide any reason for not doing so.  *See* Tr. 30-32; *see also* Tr. 285-86.  The ALJ's evaluation of Plaintiff's residual functional capacity also overlooked Dr. Jones' opinion that Plaintiff should work in a low-stress environment.  It was error for the ALJ not to consider such a significant limitation because, again, Regulations required the ALJ to consider Plaintiff's severe and non-severe impairments when assessing his residual functional capacity.  *See* 20 C.F.R. §404.1545(a)(2); *see also* *Simpson*, 344 Fed.Appx. at 190-91.

The ALJ's error in failing to consider Plaintiff's severe and non-severe impairments at Step 4 infected the ALJ's finding that Plaintiff could perform his past

20

relevant work as a mediator.  *See* Tr. 32.  This is seen in the vocational expert's testimony that an individual with Plaintiff's residual functional capacity plus the further restriction to simple, repetitive work could not perform the job of a mediator.  *See* Tr. 57-58.

The ALJ's error continued to cause problems at Step 5 where the ALJ alternatively found that Plaintiff could perform a significant number of jobs that exist in the national economy.  (Tr. 33).  The problem again is that this finding was based on the ALJ's legally flawed assessment of Plaintiff's residual functional capacity.  *See Simpson*, 344 Fed.Appx. at 191-92 ("hypothetical question posed to a [vocational expert] for purposes of determining whether [claimant] can perform other work ... should include an accurate portrayal of her individual physical and <u>mental impairments</u>.")(quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002); citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004)).

Accordingly, Plaintiff's challenges concerning the ALJ's failure to consider his medically determinable mental impairments when assessing his residual functional capacity are well taken.[6]

### B.  <u>Remand is Warranted</u>

When an ALJ fails to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the

---

[6] In light of the above review and the resulting need for remand of this case, analysis of Plaintiff's remaining contentions is unwarranted.

case for rehearing or to reverse and order an award of benefits.  Under sentence four of

42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the

Commissioner's decision "with or without remanding the cause for rehearing."

*Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the

Commissioner applied an erroneous principle of law, failed to consider certain evidence,

failed to consider the combined effect of impairments, or failed to make a credibility

finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Plaintiff seeks a remand for payment of benefits.  Such a remand is unwarranted

because the evidence of disability is not overwhelming and because the evidence of a

disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social

Security Administration pursuant to Sentence Four of §405(g) due to the problems set

forth above.  On remand the ALJ should be directed to consider the impact Plaintiff's

medically determinable mental health impairments have at Steps 2, 3, 4, and 5 of the

sequential evaluation and determine anew whether Plaintiff was under a disability and

thus eligible to receive DIB.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Khabeer Akbar was under a
        "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.

January 25, 2011                                                    s/Sharon L. Ovington
                                                    Sharon L. Ovington
                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

24